1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

RICHARD LANCASTER,

Defendant.

Case No. 3:24-CR-00010-ART-CLB

ORDER ON DEFENDANT'S MOTION TO SUPPRESS

(ECF No. 34)

Before the Court is Mr. Lancaster's motion to suppress evidence and statements related to the search of his home and his arrest on September 14, 2023, based on alleged violations of the Fourth and Fifth Amendments. (ECF No. 34.) The Government filed an opposition, and Mr. Lancaster filed a reply. (ECF Nos. 40, 44.) The Court held an evidentiary hearing on July 30, 2025. (ECF No. 48.) For the reasons stated below, the Court grants in part and denies in part Mr. Lancaster's motion.

## I.    FACTUAL BACKGROUND

Mr. Lancaster pleaded guilty in 2010 to Promotion of Sexual Performance of a Minor Fourteen Years of Age or Older in the Second Judicial District in Washoe County. (ECF No. 40-1.) In 2018, he signed a parole agreement which listed several conditions of his parole. (ECF Nos. 40-1, 40-2.) Relevant here, the parole agreement provides:

- You shall comply with all institutional rules, municipal, county, state, and federal laws and ordinances.
- [You shall] [n]ot possess any sexually explicit material that is deemed inappropriate by the parole and probation officer assigned to the parolee.
- [You shall] [n]ot possess any electronic device capable of accessing the Internet and not access the Internet through any such device or any other means, unless possession of such a device or such access is approved by the parole and probation officer assigned to the parolee.
- [You shall] [n]ot have contact with a person less than 18 years of age in a secluded environment unless another adult who has never been convicted of an offense listed in NRS 179D.097 is present and permission has been

obtained from the parole and probation officer assigned to the parolee in advance of each such contact.

- Parolee is prohibited from being alone with a child unless another adult who has never been convicted of a sexual offense is present.

(ECF No. 40-2.) Additionally, the agreement states: "I shall submit my person, property, place of residence, vehicle, or areas under my control to search at any time of the day or night, with or without a search warrant or with or without cause, for evidence of a crime or violation of parole by a Parole Officer or any other Peace Officer." (*Id.*)

## A. August 29, 2023, University of Nevada, Reno Traffic Stop

### 1. Initial Stop

On August 29, 2023, University of Nevada, Reno ("UNR") police officers Cantu and Wasser observed Mr. Lancaster holding a cell phone out of the window of his vehicle while driving on Virginia Street in Reno, Nevada, near the UNR campus. (ECF No. 34-1.) Officer Cantu pulled over Mr. Lancaster. (*Id.* at 00:25.) When he approached the vehicle, he asked Mr. Lancaster, "Do you know the reason I stopped you?" (*Id.* at 00:45) to which Mr. Lancaster responded that he did not. Officer Cantu said, "Okay, well, down Virginia Street, passing 10th Street, you had your phone out the window." (*Id.* at 00:50.) Mr. Lancaster further explains that he was taking video with his phone. (*Id.* at 1:08.) Approximately three minutes into the stop, Officer Cantu tells Officer Wasser that he plans to "run" Mr. Lancaster and then "give him the warning." (*Id.* at 3:01.) As discussed below, the officers did ultimately issue Mr. Lancaster a citation for violation of NRS 484B.165.4A, Nevada's law prohibiting texting or calling while driving. (ECF No. 34-2.) The citation states, "While in the patrol vehicle I observed the driver holding his phone out of the window while operating the vehicle." (ECF No. 34-2.)

### 2. Investigation of Parole/Sex Offender Violations

Approximately four or five minutes into the stop, the officers learn from

1    their records checks that Mr. Lancaster is on the sex offender registry. (*Id.* at

2    4:42.) Nine minutes into the stop, Officer Wasser confirms that "we've already

3    decided we're not going to cite him." (*Id.* at 9:01.) Approximately 20 minutes into

4    the stop, the officers begin investigating if Mr. Lancaster has violated any

5    conditions of his parole. (*Id.* at 19:25.) They discuss possible violations based on

6    electronic devices and places sex offenders are prohibited from going. (*Id.* at

7    19:45-21:45.) Officer Wasser suggests calling Mr. Lancaster's probation officer to

8    see if the cell phone he was holding is authorized, which Officer Cantu does. (*Id.*

9    at 21:40.) Around 31 minutes into the stop, Officer Cantu leaves a voicemail for

10   Mr. Lancaster's probation officer, Officer Cain, telling him that he stopped Mr.

11   Lancaster, who had a cell phone and was "filming for his website." (*Id.* at 30:48-

12   31:46.) Officer Cantu tells Officer Wasser and other officers that arrived on scene,

13   "as of right now he isn't violating any conditions." (*Id.* at 33:45.) Officer Wasser

14   clarifies that they don't know if Mr. Lancaster has permission to have that phone,

15   thus they do not know if he is violating any conditions of his parole. (*Id.* at 33:55-

16   34:10.) At around 38 minutes, another officer suggests that issuing a citation

17   would be "further proof" of a violation when his parole officer follows up with him.

18   (*Id.* at 37:40-38:30.) Another officer suggests that Officer Cantu call in a violation

19   to dispatch so that dispatch can reach out to his parole officer, to "get a better

20   answer." (*Id.* at 38:50-39:20.) At this point, Officer Cantu changes his mind about

21   issuing a citation. (*Id.* at 40:40.) He calls dispatch and tells them that Mr.

22   Lancaster is violating his parole conditions, asks dispatch to advise his parole

23   officer, and advises dispatch that they have a traffic citation. (*Id.* at 41:55.) At

24   forty-three minutes, Officer Wasser checks with Officer Cantu about how much

25   time they have left to write the citation.[1] (*Id.* at 43:55.) They determine the stop

26   has been 45 minutes. (*Id.* at 44:08.) At about 50 minutes, Officer Cantu finishes

27

28   ---

[1] Under Nevada law, "A person must not be detained longer than is reasonably necessary . . . and in any event no longer than 60 minutes." NRS 171.123(4).

writing the citation and asks if they can "wait" for probation to get back to them. (*Id.* at 49:28-49:40.) He notes that they have 10 more minutes. (*Id.* at 50:03.) At this point, the officers do appear to wait, as the citation has already been written. At about fifty-five minutes, Officer Cantu calls dispatch to see if they got ahold of probation. (*Id.* at 54:55-55:50.) After dispatch explains that they have not reached probation, Officer Wasser says, "okay we're done," and Officer Cantu issues Mr. Lancaster the citation. (*Id.* at 55:53-56:40.)

At the evidentiary hearing, Officer Cain testified that he received a voicemail from a UNR police officer "approximately a week and a half to two weeks" before September 14, in which a UNR officer "wanted to advise me that Mr. Lancaster was using a phone to take pictures and possibly record students on or around the campus." Officer Cain also recalled that the UNR officer said that Mr. Lancaster had a smartphone. At the hearing, Officer Cain could not recall exactly when he listened to this voicemail, and at one point stated that he got a phone call on a "Friday."

**B. September 9, 2023, Sparks Police Department Report**

On September 9, 2023, Officer Tavcar with Sparks Police Department ("SPD") received a report from a coworker of Mr. Lancaster. (ECF No. 40-3.) The coworker completed a written statement which says that he overhead Mr. Lancaster stating that he had a 13-year-old girlfriend, that there was a picture of her on his phone in sweats and a red top, and that Mr. Lancaster had said that he follows her on YouTube, that he talks to these girls on dating apps and YouTube, and is trying to find where she lives and wanted to "pick her and her 10 year old cousin up and drive them to the mountains." (*Id.* at 5-6.)

Officer Cain testified that he received a phone call from a Detective Slider with SPD regarding this report on the morning of September 14, 2023. Officer Cain recalled that this phone call informed him about the statements about dating a 13-year-old girl Mr. Lancaster had found on YouTube, and that there

1    was an image of the girl on his phone in a red shirt and gray pants. (*Id.*)

2    **C. September 14, 2023 Parole Home Search**

3    Later that same day, Officer Cain and another parole and probation officer,

4    Officer Arellano, went to Mr. Lancaster's residence. The video from Officer Cain's

5    body-worn camera shows Mr. Lancaster opening the door after the officers knock.

6    (ECF No. 34-3 at 1:20.) Mr. Lancaster is in boxers and a t-shirt and tells them

7    he's been sleeping. (*Id.*) Both officers step inside the residence, which appears to

8    be a motel room: one room with an attached closet and bathroom. (*Id.* at 1:25-

9    45.) Officer Arellano stands in front of the door throughout the search. (*Id.* at

10   1:50-10:30.) Officer Cain tells Mr. Lancaster to "take a seat for me," gesturing to

11   the bed, where Mr. Lancaster sits. (*Id.* at 1:25.)

12   Officer Cain asks Mr. Lancaster "you got your phone on you?" and Mr.

13   Lancaster hands him a flip phone, which was on his bedside table. (*Id.* at 2:15.)

14   Officer Cain then asks, "you got your other phone on you? No? I know you have

15   another phone. I got a phone call on Friday from UNR police." (*Id.* at 2:20.) Mr.

16   Lancaster picks up a smartphone from the same bedside table, which he provides

17   to Officer Arellano. (*Id.* at 2:30.) Officer Arellano asks Mr. Lancaster for the

18   passcode to the phone, which Mr. Lancaster provides verbally. (*Id.* at 3:25-34.)

19   Officer Arellano opens the phone and begins looking through it. (ECF No. 34-4 at

20   3:20). He shows Officer Cain the screensaver, which appears to be a girl in a red

21   shirt, and images in the phone's camera roll, which appear to be pornography.

22   (*Id.* at 3:20-4:45.)

23   Officer Cain then asks if Mr. Lancaster has any other devices and begins

24   searching the room. (ECF No. 34-3 at 5:50). He eventually finds a laptop

25   computer under the bedding on Mr. Lancaster's bed. (*Id.* at 9:15.) He asks Mr.

26   Lancaster, "are we gonna find child porn or anything?" Mr. Lancaster responds,

27   "I don't think so." (*Id.* at 9:44-9:53.) Officer Cain then asks for the password to

28   the computer, which Mr. Lancaster refuses to provide. (*Id.* at 10:10-10:24). Mr.

Lancaster requests a lawyer, and Officer Cain tells him he is not under arrest. (*Id.* at 10:38). Mr. Lancaster reiterates that he wants to talk to a lawyer, at which point Officers Can and Arellano handcuff him, tell him that he is being taken in on a parole violation for the unauthorized devices, and walk him to a patrol vehicle. (*Id.* at 10:44-12:30.) Mr. Lancaster was not given his *Miranda* rights at any point during the questioning.

### D. Medical Interview at Washoe County Jail

Officers Cain and Arellano bring Mr. Lancaster to Washoe County Jail. They walk him out of the patrol vehicle and into a hallway inside the jail, where he is directed to sit on a bench. (ECF No. 34-4 at 47:00-47:55). He is then interviewed by jail medical staff, who ask him a series of questions about physical health while putting what appears to be a blood pressure monitor cuff on him. (*Id.* at 48:00-49:28.) Officers Cain and Arellano are standing on the other side of the hallway. (*Id.* at 48:26.) One of the jail medical staff then asks, "any mental health conditions?" to which Mr. Lancaster responds, "mental health, yeah. Just mentally ill and can't stay away from child porn." (*Id.* at 49:25-35). This was captured by Officer Arellano's body camera. (*Id.*).

A superseding indictment on June 20, 2024, charges Mr. Lancaster with one count of Possession of Child Pornography in violation of 18 USC §§ 2252A(a)(5)(B) and (b)(2). (ECF No. 19.) The indictment charges that the child pornography was on his ASUS Laptop and his Motorola Edge Cell Phone. (*Id.*)

## II.    FOURTH AMENDMENT

Mr. Lancaster argues that the Motorola Edge Cell Phone ("smartphone") and laptop seized during the September 14, 2023, search of his home should be suppressed because it was obtained in violation of the Fourth Amendment. Mr. Lancaster argues (1) that the initial UNR stop was illegal because it was made without reasonable suspicion of a traffic violation, and (2) that even if the initial stop was legal, it was illegally prolonged. Because the stop was illegal, Mr.

Lancaster argues, any evidence seized as a result of that illegal seizure must therefore be suppressed. The Government does not concede that the stop was illegal but did not put forth any evidence or argument to show that the stop was in fact legal. For the reasons discussed below, the Court finds that while the stop was illegally prolonged, an independent source caused the search of Mr. Lancaster's apartment, and thus suppression of the evidence obtained within is not warranted.

### A. Legal Standard

The Fourth Amendment to the United States Constitution protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. An officer must have "reasonable suspicion" of illegal activity in order to conduct a traffic stop. *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006). Additionally, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "A seizure for a traffic violation justifies a police investigation of that violation," however, "because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose" and "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are— or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). Prolonging the stop in such a manner violates the Fourth Amendment "unless the officer had independent reasonable suspicion to support such a prolongation." *United States v. Evans*, 786 F.3d 779, 787-88 (9th Cir. 2015) (citations omitted).

"Evidence seized pursuant to an unjustified and illegal search must be suppressed." *United States v. Manansingh*, 281 F. Supp. 3d 1096, 1100 (D. Nev. 2017), *aff'd,* 733 F. App'x 390 (9th Cir. 2018) (citing *Wong Sun v. United States*, 371 U. S. 471, 488 (1963)). The exclusionary rule encompasses "evidence seized

during an unlawful search," and also the "indirect . . . products of such invasions." *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir.), *order corrected*, 870 F.3d 963 (9th Cir. 2017) (quoting *Wong Sun*, 371 U.S. at 484). Evidence which is "derivative" of a Fourth Amendment violation is considered the "fruit of the poisonous tree," which is "tainted by the prior illegality and thus inadmissible." *Id.* (internal citations and quotation marks omitted).

**B. Analysis**

**1. The UNR Traffic Stop Was Unconstitutionally Prolonged.**

Mr. Lancaster first argues that the initial stop was unlawful because the officers lacked reasonable suspicion that he was committing a traffic violation: he was holding his phone out his window, which is not illegal in Nevada, and there was no evidence that he was texting or calling, which would violate NRS 484B.165. The Court need not address whether the stop of Mr. Lancaster was lawful because the Court finds that the stop was illegally prolonged.

This is similar to the situation in *U.S. v. Evans*, where the Ninth Circuit found that police had prolonged a traffic stop. In *Evans*, the officer stopped the Mr. Lancaster for a minor traffic violation. 786 F.3d 779, 786 (9th Cir. 2015). After performing routine checks regarding vehicle records and warrants, he initiated an "ex-felon registration check," which prolonged the stop for eight minutes. *Id.* The Court found that the check was "wholly unrelated" to the mission of a traffic stop—"ensuring that vehicles on the road are operated safely and responsibly." *Id.* Rather, it was "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing" and "in no way advanced officer safety." *Id.* at 787 (citing *Caballes*, 543 U.S. at 408, and *Rodriguez*, 575 U.S. at 356-57).

The same is true here. Officer Cantu stated that he planned to "run" Mr. Lancaster and give him a warning three minutes into the stop. After the officers learned that Mr. Lancaster is on the sex offender registry four minutes into the stop, he again reiterated this decision, approximately nine minutes into the stop.

However, instead of issuing Mr. Lancaster a warning, the officers proceeded to investigate Mr. Lancaster's sex offender and parole status, attempting to determine if he might be violating some condition of parole. At the point at which Officer Cantu calls Officer Cain to tell him about the cell phone and inquire if it is a permitted device—thirty-one minutes into the stop—he had already decided not to cite him and to issue him a warning. Like in *Evans*, Officer Cantu was no longer doing anything related to the "mission" of a traffic stop, and there is no evidence in the record that this investigation advanced officer safety or was justified by independent reasonable suspicion of a crime. *See id.* at 787-89 (finding that officer safety was not at issue and remanding to district court to determine if there was independent reasonable suspicion). Additionally, "[s]everal district courts in the Ninth Circuit have similarly held that probation-related questions are outside the mission of a traffic stop." *United States v. Hoover*, No. 2:20-CR-00273-JCM-BNW, 2022 WL 6239512, at *12 (D. Nev. July 13, 2022), *report and recommendation adopted,* No. 2:20-CR-273-JCM-BNW, 2022 WL 4009013 (D. Nev. Sept. 2, 2022).

The Court therefore finds that the August 29, 2023, traffic stop was illegally prolonged in violation of the Fourth Amendment.

**2. The Parole Home Search**

Mr. Lancaster argues that under the "fruit of the poisonous tree" doctrine, the evidence seized during the September 14, 2023, search of his residence should be suppressed because the phone call to Officer Cain during the illegal stop was the impetus for the search. The Government argues that the independent source doctrine applies, and that the officers' search was instigated not because of the phone call from UNR police regarding the traffic stop, but because of the phone call from SPD regarding Mr. Lancaster's co-worker's police report.

"[T]he independent source doctrine allows trial courts to admit evidence

obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Gorman*, 859 F.3d at 718 (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)). "[T]he independent source doctrine asks whether the evidence *actually* was 'obtained independently from activities untainted by the initial illegality.'" *United States v. Lundin*, 817 F.3d 1151, 1161 (9th Cir. 2016) (quoting *Murray v. United States*, 487 U.S. 533, 537 (1988). It is a defendant's initial burden to show specific evidence demonstrating an unconstitutional taint; "[t]he burden then shifts to the government to show that it acquired its evidence from an independent source." *United States v. Cella*, 568 F.2d 1266, 1284-85 (9th Cir. 1977).

### a. Independent Source Doctrine applies to the Laptop but not the Smartphone.

The Court finds that the Government has met its burden to show that the laptop was discovered by means independent of the illegal stop, but not the smartphone.

Office Cain testified that when he got the voicemail from Officer Cantu about the possible unauthorized smartphone, he did not follow up because "it wasn't a high priority for me," and he was not sure it was a violation of Mr. Lancaster's parole to have the phone because "I had just received Mr. Lancaster's case August 30th from another officer, and I was not sure if the previous officer had allowed him to have it." Since he had just received this case, he said, after the voicemail he just intended to do a normal check-in with Mr. Lancaster within the next 30 or 60 days. In contrast, when Officer Cain received the phone call about the coworker's police report from SPD on September 14, 2023, "[i]t was definitely a top priority concerning it involved a minor and possible electronics he was not allowed to have access to." Based on the phone call, he suspected parole violations for being in contact with a minor and having internet access, based on the comment about YouTube. He explained in his testimony that the SPD report

was more concerning than the UNR call because it involved a minor. He, Detective Slider from SPD, and Officer Arellano went to search Mr. Lancaster's residence that same day. The Court finds Officer Cain's testimony credible.

### i.    Smartphone

The evidence suggests that the phone call from UNR was the specific impetus for Officer Cain asking for and receiving Mr. Lancaster's unauthorized smartphone. Upon entering Mr. Lancaster's home, Officer Cain immediately began asking him about his "other phone," and even stated "I know you have another phone. I got a phone call on Friday from UNR police." (ECF No. 34-3 at 2:20.) He asked about the "other phone" before opening the (authorized) flip phone, which indicates that he did not yet know whether that phone was indeed the phone with a picture of the minor on it. (*Id.*) Officer Arellano also identified the UNR videos while looking through Mr. Lancaster's phone and showed them to Officer Cain. (*Id.* at 5:20.) While the SPD report gave the officers notice that Mr. Lancaster might possess a phone with a picture of a young girl on it and a device that could access the internet, this did not necessarily put them on notice of a "second phone" in the way that the UNR call did—Office Cain testified at the evidentiary hearing that admittedly a flip phone could have pictures and screen savers on them. To meet its burden under the independent source exception, the Government must show that the evidence was *actually* obtained independently from the illegal UNR stop. *Lundin*, 817 F.3d at 1161. The Court finds that the Government has failed to do so.

### ii.    Laptop Computer

In contrast, the evidence presented suggests that officers went to Mr. Lancaster's residence on September 14 because of the SPD phone call, not the UNR phone call. While the UNR stop may have specifically directed the officers to the "second phone," it made no mention of the laptop. Rather, the laptop was found solely as a result of the search of Mr. Lancaster's apartment, which the

Court finds was done in response to the SPD phone call, and not the UNR call. The Government has met its burden to show that the laptop was obtained independently of the illegal UNR stop, and the independent source exception applies.

### b. Inevitable Discovery Doctrine applies to the Smartphone.

While the Court finds that the Government has not met its burden to show that the unauthorized smartphone was discovered due to the SPD call, the Court finds that the inevitable discovery exception applies to the smartphone.[2]

The inevitable discovery exception to the exclusionary rule permits admission of evidence that, although found through means which are unconstitutionally tainted, would have inevitably been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 443-44 (1984). This exception applies "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444. "The government can meet its burden by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).

Officer Cain testified that he always does a search when he checks in with his sex offender parolees. Even with no suspicions of a parole violation, he is "searching mainly for electronic devices that have not been reported," because "especially with sex offenders it's common that they have a second or third electronic device that they don't report." When he has a suspicion of a parole violation, he searches more in depth. As discussed, Officer Cain testified that he knew when he entered Mr. Lancaster's apartment that he might be in possession

---

[2] While the Court holds that the search of the laptop was lawful under the independent source doctrine, it further holds that it was lawful under the inevitable discovery doctrine.

of an unauthorized device that can access the internet, based on the SPD report. He therefore had reason to do an in-depth search for unauthorized electronic devices in the apartment, and specifically, for a phone with an image of a minor on the background. While the Government does not make a "plain view" argument, it is undisputed that the smartphone was on Mr. Lancaster's nightstand in his residence during the search. Officer Cain found a laptop under the covers of Mr. Lancaster's bed during his search.

Based on these facts, Officer Cain would have inevitably discovered the smartphone during his search, even in the absence of the UNR phone call, through routine police procedures following the SPD report. *United States v. Martinez-Gallegos*, 807 F.2d 868, 870 (9th Cir. 1987) (inevitable discovery doctrine applied where, had defendant refused to answer questions, officers would have learned the same information by consulting his immigration file); *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986) (inevitable discovery doctrine applied where evidence would have been discovered through normal procedure of inventorying a defendant's possessions at booking); *United States v. Hylton*, 30 F.4th 842, 849 (9th Cir. 2022) (inevitable discovery doctrine applied where, despite unlawfully prolonged stop, the officers would have discovered defendant's felony status minutes later and pulled him over again); *United States v. McKathan*, No. CR 14-00290-KD-C, 2021 WL 707651 (S.D. Ala. Feb. 23, 2021) (inevitable discovery doctrine applied where parole officer would have searched probationer's phone based on reasonable suspicion that he was violating probation condition). Therefore, the Court finds that Mr. Lancaster's smartphone is admissible under the inevitable discovery doctrine.

### III.    FIFTH AMENDMENT

Mr. Lancaster argues that the statements he made during the search of his residence should be suppressed because they were made in violation of *Miranda* and were compelled in violation of the Fifth Amendment. Mr. Lancaster argues

13

that Officer Cain and Arellano's questioning of him during the search was a custodial interrogation, which violated his Fifth Amendment rights because he was never read his *Miranda* rights. He also argues that the officers' request for his smartphone password was "compelled" under threat of revocation of his parole, in violation of the Fifth Amendment.

### A. Legal Standard

The Fifth Amendment protects criminal defendants from self-incrimination by barring statements that are (1) compelled; (2) incriminating; and (3) testimonial. U.S. Const. amend. V., *U.S. v. Payne*, 99 F.4th 495, 507 (2024) (citing *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.,* 542 U.S. 177, 189 (2004)).

Under *Miranda v. Arizona*, a person must be advised of their Fifth Amendment rights before being subject to a custodial interrogation. 384 U.S. 436, 479 (1966). Statements made by a defendant in a custodial interrogation without *Miranda* warnings are generally inadmissible. *United States v. Mora-Alcaraz*, 986 F.3d 1151, 1153 (9th Cir. 2021). Even where a defendant is not formally arrested, they are "nevertheless considered 'in custody' for purposes of *Miranda* if the suspect has been 'deprived of his freedom of action in any significant way.'" *U.S. v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444.) An "interrogation" is defined "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *United States v. Williams*, 842 F.3d 1143 (9th Cir. 2016). It is the defendant's burden to show that he was in custody during an interrogation. *United States v. Bassignani*, 560 F.3d 989, 996 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 575 F.3d 879 (9th Cir. 2009).

### 1. Mr. Lancaster's Status as a Parolee Does Not Diminish His Fifth Amendment Rights.

As an initial matter, the Government argues that Mr. Lancaster's Fifth Amendment rights are severely diminished in this situation because he is a parolee. However, case law addressing the issue counsels the opposite: in *Oregon v. Mathiason*, the Supreme Court analyzed whether a parolee who was questioned at a police station about a burglary was in custody for the purpose of *Miranda*. 429 U.S. 492, 494-96 (1977). The Court made no mention of the defendant's status as a parolee in its analysis and proceeded with a traditional analysis of custody under *Miranda*. *Id.*; *see also Minnesota v. Murphy*, 465 U.S. 420, 429-33 (1984) (analyzing whether a probationer was subject to a custodial interrogation by a probation officer); *United States v. Fane*, No. 2:22-CR-20063-1, 2022 WL 14461378, at *4 (E.D. Mich. Oct. 25, 2022) (rejecting argument that *Miranda* warnings are not required before officers asked parolee, while in custody, if he had any weapons in violation of his parole conditions). The Government offers no support for the contention that Mr. Lancaster loses Fifth Amendment protections due to his status as a parolee.

**B. Mr. Lancaster Was in Custody When Officers Asked Him Questions in His Home.**

Courts in the Ninth Circuit look to several factors in determining whether an interrogation was custodial. In *U.S. v. Craighead*, the Ninth Circuit identified several factors to consider in determining whether an in-home interrogation was custodial. 539 F.3d at 1084. These include, but are not limited to, "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Id.*

In *Craighead*, eight armed officers from three law enforcement agencies entered the defendant's home. *Id.* at 1085. The defendant was never handcuffed

or physically restrained but was "escorted to a back storage room and the door was closed behind him," and the defendant testified that that one officer appeared to block his exit from the room. *Id.* at 1086. He was also isolated because the officers controlled who could come into the storage room; however, he was told that he was not under arrest and that his answers were voluntary. *Id.* at 1087-88. In weighing these factors, the Ninth Circuit concluded that the defendant was in custody during his questioning, because the four factors indicated that his home had become a "police dominated atmosphere." *Id.* at 1089.

Here, two officers entered Mr. Lancaster's residence—a small, one room motel room with an attached bathroom, and only one exit. Two other law enforcement officers from SPD waited outside. The officers had chest rigs, handcuffs, and appeared to be wearing weapons. In *Craighead*, the Ninth Circuit noted that "[w]hen a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation." *Id.* at 1084. And when they outnumber the suspect, "the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out." *Id.* at 1084-85. While there were not as many officers present in Mr. Lancaster's home as in *Craighead*, the presence of two police officers in chest rigs, with handcuffs and weapons visible, in such a small space, weighs in favor of a finding of custody.

While Mr. Lancaster was not physically restrained until the end of the interrogation, he was immediately ordered to take a seat on the bed when the officers entered the residence. Officer Arellano stood in such a way that he blocked the only exit to the residence. Because Mr. Lancaster's residence is so small, he was essentially in the same scenario as the defendant in *Craighead*— in a single room with police officers, with the single exit blocked by an officer. *See id.* at 1086. As in *Craighead*, this factor also accordingly weighs in favor of

custody. *See id.* In terms of isolation, Mr. Lancaster was the only person living in his residence, so this factor weighs in neither direction.

Unlike in *Craighead*, Mr. Lancaster, who was directed to sit on the bed, was never told that he was free to leave. At the end of the interrogation, Officer Cain tells him "you're not under arrest," but then puts Mr. Lancaster in handcuffs. (ECF No. 34-3 at 10:38). This factor weighs in favor of custody.

Considering the factual circumstances under the four factors above, the Court finds that Mr. Lancaster was in custody for the purposes of *Miranda*. Here, while there were less police officers present, Mr. Lancaster was interrogated in a smaller space—essentially a single room—told to sit in a certain place, with one officer blocking the exit. He was also never told he was free to leave. The Court finds that like in *Craighead*, Mr. Lancaster's home had become a "police dominated atmosphere," in which Mr. Lancaster would not have felt that he was free to leave. 539 F.3d at 1089.

### C. Mr. Lancaster Was Interrogated by Officers.

"Only questions 'reasonably likely to elicit an incriminating response from the suspect' amount to interrogation." *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000) (quoting *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981)). Importantly, any questions by police which "*police should know* are likely to elicit an incriminating response" constitute an interrogation. *United States v. Parkins*, 92 F.4th 882, 893 (9th Cir. 2024) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

The Government argues that because the questioning was directed at parole violations, Mr. Lancaster did need not to be *Mirandized*. This argument was implicitly rejected by the Court in *Fane*. 2022 WL 14461378, at *4. There, officers asked a parolee, who was a felon, whether he had any weapons in his home—which would have been both a violation of his probation and a crime. *Id.* The Court rejected this argument and found that because the defendant was in

17

custody while asked this question, *Miranda* warnings were necessary. *Id.*

Here, the officers asked Mr. Lancaster several questions they should have known were likely to elicit an incriminating response. The context in which these questions were asked is key to this analysis. The officers were aware of the SPD report about contact with a minor and a potential picture of a minor on a phone. They brought SPD officers with them to the search. SPD is not state parole and its interest is in criminal activity, not Mr. Lancaster's parole violations.

The Government argues that these questions are routine questions that a parole officer would ask a parolee who they suspect is in violation of a condition (here, having an unauthorized device). The context of the questioning, as discussed, suggests that the officers were not just looking for parole violations, but were looking for evidence of a crime—child pornography—and knew that answers about ownership of the phone could be incriminating. The Court finds that these questions constitute an interrogation.

### a. Questions About the Existence of Mr. Lancaster's Phone Constituted a Custodial Interrogation.

The officers had reason to believe they would likely elicit an incriminating response when they asked, "[y]ou got your phone on you? I know you have another phone;" "How come you haven't told us about this phone?;" "How long ago [did you get the phone]?;" and "You know you can't have that without permission?" (ECF No. 34-3 at 2:12-31.) The officers knew based on their call with SPD that Mr. Lancaster had a phone that was likely to contain child pornography. (ECF No. 40 at 6.) They knew that by confirming possession of the phone, Mr. Lancaster would also be incriminating himself for the possession of child pornography. (*Id.*) *See United States v. Payne*, 99 F.4th 495, 510 (9th Cir. 2024) (the act of confirming possession of a device "instantly concedes [...] ownership or access to [...] all its digital contents"). Therefore, officers were required to give Mr. Lancaster *Miranda* warnings before interrogating him about

the existence of his second phone.

In addition, these initial questions appear to be fruit of the poisonous tree, i.e., the unlawful UNR stop. Officer Cain told Mr. Lancaster, "I know you have another phone. I got a phone call Friday from UNR police." (ECF No. 40 at 6.) As discussed above, the Government has not met its burden to prove that the officers' knowledge of Mr. Lancaster's second device was premised on the SPD report. Officer Cain's choice of words indicates that it was at least relevant to the decision to ask Mr. Lancaster where the phone was. Therefore, these statements should also be suppressed as being derived from a Fourth Amendment violation.

### b. Questions About Phone Password Constituted a Custodial Interrogation and Were Unconstitutionally Compelled.

The parole officers' demand for Mr. Lancaster's phone password amounted to interrogation because the password would allow the officers to confirm that there was evidence of criminal activity on his device. *See Payne*, 99 F.4th at 510. Therefore, officers were required to give Mr. Lancaster *Miranda* warnings before demanding his phone passcode. Independent of *Miranda*, demanding Mr. Lancaster's phone password also violated Mr. Lancaster's Fifth Amendment right against self-incrimination because the officers compelled him to provide incriminating, testimonial information.

Imposing a penalty on a speaker for invoking their privilege to remain silent is a "self-executing" invocation of the Fifth Amendment. *See McKathan v. United States*, 959 F.3d 1213, 1224 (11th Cir. 2020) (citing *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967)). In the probation context, this means the probationer "may not be required under threat of revocation of probation to respond to questions put to him, however relevant to probationary status, that call for answers that would incriminate him in a pending or later criminal proceeding." *U.S. v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005) (cleaned up).

Compelling an individual to share his alphanumeric passcode "requires an

individual to divulge the contents of his mind." *Payne*, 99 F.4th at 510; *In the Matter of the Search of a Residence in Oakland, California*, 354 F. Supp. 3d 1010, 1015 (N.D. Cal. 2019) (internal citations omitted) (collecting cases) ("The expression of the contents of an individual's mind falls squarely within the protection of the Fifth Amendment [as testimonial]"). Mr. Lancaster was asked to produce his passcode while he was in custody, which he and the officers knew he could not refuse to do without violating his parole. (ECF No. 40 at 19 ("it would be a separate violation of [Mr. Lancaster's] parole conditions if he refused to give the parole officers his password to assist in the searching of his device").) He was therefore compelled to provide testimonial information.

Providing a passcode is considered incriminating where one could reasonably believe that access to the "vast trove of personal information" inside a cellphone would lead to evidence that could be used against a defendant in a criminal proceeding. *Payne*, 99 F.4th at 508. The officers suspected, based on the SPD report, that Mr. Lancaster had photos of a minor on his phone. They confirmed there was a picture on the screensaver of his smartphone of a girl that looked like the description from their informant. They therefore had reason to believe that providing his password would lead to the discovery of child pornography on his second device and therefore be incriminating.

Mr. Lancaster was compelled to answer questions that would incriminate him by state parole and probation officers because his failure to do so was on pain of revoking his parole.

Based on the *Miranda* and constitutional violations, Mr. Lancaster's statement regarding his phone passcode will be suppressed. Though evidence obtained as result of the Fifth Amendment violation is normally suppressed, here, as discussed above, the Government has met its burden of showing that the smartphone and laptop would have been searched in the normal course of a parole violation, so the inevitable discovery doctrine applies, and thus the

contents of the smartphone and laptop computer are admissible.[3]

### c. Questions About Child Pornography on Laptop Constituted a Custodial Interrogation.

Officer Cain explicitly asked Mr. Lancaster if he had child pornography on his computer. (ECF No. 34-3 at 9:44-9:53). Mr. Lancaster replied, "I don't think so." (*Id.*) This is a classic "darned if you do, darned if you don't" scenario that would require Mr. Lancaster to incriminate himself or violate his parole conditions. *McKathan*, 969 F.3d at 1216.

Although the Government argues that this was simply a matter of searching for parole violations, the questions were reasonably likely to elicit an incriminating response. Parole and probation officers went to Mr. Lancaster's home with the knowledge of an SPD report alleging Mr. Lancaster was interacting with a minor. Two SPD officers accompanied parole and probation on their search. Upon finding his smartphone, officers immediately saw a picture of a young girl as his screensaver, confirming the SPD report. P&P officers then asked Mr. Lancaster directly about whether there was child pornography on his device. This is similar to *Fane*, where police officers had evidence that the defendant had a gun, which is both a violation of his parole conditions and a crime. The parties

---

[3] In light of this conclusion, the Court is not persuaded that the "foregone conclusion" doctrine applies to Mr. Lancaster's statement of his password. The Government argues that the doctrine applies because it could prove Mr. Lancaster's knowledge of his own passcode independently. (ECF No. 40 at 20.) Relevant cases appear to limit this doctrine to a defendant's non-testimonial acts in providing access to evidence. *Fisher v. United States*, 425 U.S. 391, 411-12 (1976) (admitting the existence and possession of the papers likely does not rise to the level of testimony). The doctrine does not appear to apply to testimonial acts like Mr. Lancaster being compelled to speak his alpha-numeric password. *United States v. Spencer*, No. 17-cr-00259-CRB-1, 2018 WL 1964588 at *2 (N.D. Cal. Apr. 26, 2018) (the foregone conclusion doctrine does not apply where the government compels a plaintiff "to state the password itself, whether orally or in writing"); *United States v. Booker*, 561 F. Supp. 3d 924, 935 n.2 (S.D. Cal. 2021) (foregone conclusion doctrine does not apply where agents compelled plaintiff to input his passcode in front of them).

there did not dispute that the question about any weapons in his home was an interrogation. 2022 WL 14461378, at *4. In *Murphy*, which the Government cites for its proposition that Mr. Lancaster was not in custody, the Supreme Court acknowledges that even when questions are relevant to probation violations, if they call for answers that would incriminate a defendant in a criminal prosecution, the "answers would be deemed compelled and inadmissible in a criminal prosecution." *Murphy*, 465 U.S. at 435.

Because the officers were looking to find criminal activity on Mr. Lancaster's phones and laptop computer, their questions about these devices and their contents are not just questions about parole and probation violations; they are questions which the officers knew would be reasonably likely to elicit an incriminating response. These questions constitute an interrogation. Because the Mr. Lancaster was in custody and interrogated without being given *Miranda* warnings, his statements must be suppressed.

## IV.   PSYCHIATRIST-PATIENT PRIVILEGE

### A. Legal Standard

The Supreme Court has long recognized a federal psychotherapist-patient privilege, protecting "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment." *Jaffee v. Redmond*, 518 U.S. 1, 10-15 (1996). The Ninth Circuit broadened the range of covered providers to which the privilege can extend to include unlicensed counselors who provide a role in increasing access to mental health treatment. *Oleszko v. State Compensation Ins. Fund*, 243 F.3d 1154, 1158 (9th Cir. 2001). The Court finds that Mr. Lancaster's statements should be suppressed under this privilege.

### B. Analysis

Mr. Lancaster argues that his statements were confidential because he was interviewed about private information without knowledge that parole and

1   probation officers could hear or record the contents of the conversation. (ECF No.
2   34 at 26.) The Government argues that the fact that the conversation was in a
3   public hallway nullifies its confidentiality. (ECF No. 40 at 25-26.)

4        Statements are considered confidential based on the expectations of the
5   parties, not their location. *See U.S. v. Landor*, 699 F. Supp..2d 913, 925 (E.D. Ky
6   2009) (holding that even though communication occurred at the holding cell in
7   the Special Housing Unit, it was confidential because the participants considered
8   it to be private). Mandatory assessments by providers in institutional settings do
9   not diminish the confidentiality of their conversations. *Speaker ex rel. Speaker v.*
10  *County of San Bernardino*, 82 F. Supp. 2d 1105, 1116 (C.D. Cal. 2000) (fact that
11  county policy made meeting between officer and mental health counselor
12  mandatory does not make the communication non-confidential). Patients waive
13  the privilege where they are informed that evaluations, tests, notes, or other
14  information will be disclosed to another party. *Dorato v. Smith*, 163 F. Supp. 3d
15  837, 887 (D. N.M. 2015).

16       When Mr. Lancaster entered the jail, he was asked to sit in front of two jail
17  intake medical staff with a blood pressure monitor. (ECF No. 34-4, Ex. D, 47:46-
18  48). He was questioned about the particulars of his medical conditions, including
19  his mental health. (*Id.* at 48:04-54:10.) At no point did the providers suggest that
20  Mr. Lancaster's medical information would be shared beyond the confines of
21  diagnosis and treatment for admission into the jail population. Mr. Lancaster
22  likely would not have been able to request further privacy even if he wanted to,
23  given that the officers were "there to maintain a level of control" over him. (ECF
24  No. 40 at 26). The Court finds that the statements were intended to be
25  confidential.

26       Mr. Lancaster argues that jail intake staff were serving in a role of mental
27  health provider because they asked questions about his mental health conditions
28  and indicated a purpose to provide counseling. (ECF No. 34 at 27.) The

1  Government argues that jail intake medical staff were not his primary medical
2  provider, but do not make any other distinction as to whether the jail staff were
3  qualified under the privilege test.

4      Psychotherapist-patient privilege extends not only to those providers who
5  are offering licensed therapy services to patients, but also to conversations with
6  unlicensed mental health employees where the patient reasonably believes he is
7  speaking to a mental health provider. *Speaker*, 82 F. Supp. 2d at 1114. Medical
8  staff at the jail not only asked Mr. Lancaster about his mental health conditions,
9  but served as the only available link for him to be connected to services should
10 he need them inside. The Government itself suggests that the conversation was
11 held for the purpose of "determin[ing] . . . mental health needs," suggesting that
12 the providers would be able to meet those needs if presented. (ECF No. 40 at 26.)
13 The Court finds that jail medical staff in this instance are qualified providers
14 under the *Jaffee* test.

15     Whether a conversation between provider and patient occurred "in the
16 course of diagnosis or treatment" is a factual determination that rests on the
17 totality of circumstances. *U.S. v. Romo*, 413 F.3d 1044, 1047 (9th Cir. 2005).
18 Factors may include the nature of the relationship between the parties, the
19 patient's purpose in making the communication, the nature of the contact, the
20 timing and location, corroborating medical records, and whether mental health
21 services were provided or requested. *Id*. The Government concedes that the
22 statements it seeks to admit were "made in the course of treatment" that included
23 determining "mental health needs." (ECF No. 40 at 26.) Therefore, the statement
24 was made in the course of treatment for the sake of determining whether
25 psychotherapist-patient privilege applies.

26     Therefore, finding that Mr. Lancaster's statements were believed to be
27 confidential and made to a mental health services provider in the course of
28 treatment, the Court grants Mr. Lancaster's motion to suppress his statements

1    to jail medical intake staff.

2    **V.    CONCLUSION**

3    It is therefore ordered that the Mr. Lancaster's Motion to Suppress is

4    GRANTED in part in regards to the contents of the UNR stop under the Fourth

5    Amendment, Mr. Lancaster's statements during the parole search of his home

6    under *Miranda*, Mr. Lancaster's statement of his smartphone password under the

7    Fifth Amendment, and Mr. Lancaster's statements during his medical evaluation

8    under psychotherapist-patient privilege. The Motion to Suppress is DENIED in

9    regards to the contents of Mr. Lancaster's smartphone and laptop computer.

10    It is furthered ordered that Mr. Lancaster's Motion to Suppress will be filed

11    under seal as it contains confidential, protected, and privileged information.

12    Dated this 13th day of November, 2025.

13

14    _____
     ANNE R. TRAUM
15    UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28